UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-80207-CIV- MATTHEWMAN

PASQUAL LOPEZ,

      Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

      Defendant.

_____/



FILED BY_____ D.C.

FEB 25 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. – W.P.B.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT [DE 16, DE 19]

**THIS CAUSE** is before the Court upon Plaintiff, Pasqual Lopez's ("Plaintiff") Motion

for Summary Judgment and Brief in Support of Motion for Summary Judgment [DE 16, DE

16-2], and Defendant, Nancy Berryhill, Acting Commissioner of Social Security

Administration's ("Defendant") Motion for Summary Judgment with Supporting Memorandum

of Law and Response to Plaintiff's Motion for Summary Judgment [DE 19]. The parties have

consented to magistrate judge jurisdiction. [DE 10]. The issues before the Court are whether the

record contains substantial evidence to support the denial of benefits to Plaintiff and whether the

correct legal standards have been applied. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## I.   FACTS

On February 12, 2014, Plaintiff filed a claim for disability insurance benefits, alleging

disability beginning on May 15, 2010. [R. 10][1]. Plaintiff's claim was denied initially on June 11,

2014, and upon reconsideration on September 10, 2014. *Id.* Plaintiff filed a written request for

---

[1] All references are to the record of the administrative proceeding filed by the Commissioner in Docket Entry 8.

hearing on September 15, 2014. *Id.* The hearing was initially held on April 13, 2016, but it was continued to allow time for Plaintiff to undergo a psychological/internal consultative evaluation, and to allow for additional evidence to be submitted. *Id.* The continuation of the hearing was conducted via video on November 28, 2016. *Id.* The Administrative Law Judge ("the ALJ"), Sarah Cyrus, issued a decision on March 31, 2017, denying Plaintiff's request for benefits. [R. 10-20]. A request for review was filed with the Appeals Council and denied on January 2, 2018. [R. 1-6].

## A. Hearing Testimony

The ALJ held an initial hearing on April 13, 2016. [R. 67]. Plaintiff was first examined by the ALJ. Plaintiff was born on September 3, 1953, making him 62 at the time of the hearing. [R. 71]. Plaintiff stated that he completed two years college. *Id.* Plaintiff stated that the last time he worked was on May 15, 2010, as a supervisor and contractor. *Id.* He had worked at this job for 23 years. [R. 72]. He testified that in 2011, he received $4,158 in "leftover money" from his job. *Id.* Plaintiff stated that he left his job in 2010 due to certain medical issues which prevented him from completing his daily responsibilities in his position. *Id.* Plaintiff stated that he did not look for work after leaving, and he did not receive any government benefits. *Id.* However, he testified that he received unemployment, but it had extinguished. [R. 73]. Plaintiff stated that he has a current driver's license, but he limits driving due to his distorted vision. *Id.* He added that he does not drive at night because he has poor night vision. *Id.*

Plaintiff next described his previous job as a supervisor. Plaintiff said he supervised six staff members in the operation of a program for mentally challenged adults. [R. 74]. He worked with some adults that had jobs outside of the program, and he helped them prepare for work each day. *Id.* Plaintiff also said that he handled paperwork and transportation. *Id.* His shift was from

2

7:00 a.m. to 3:00 p.m., but he added that he occasionally worked until 5:00 or 6:00 in the evening. *Id.* He added that he often performed hands-on activities including transferring adults in his care from the bed. *Id.* He stated that he helped to teach the adults cooking, socialization, and normalization skills, and he often took them to doctor's appointments or on outings. [R. 75]. He often helped the adults with grooming and dressing. *Id.* Plaintiff testified that he had physical duties that involved lifting or carrying, like maintaining the adults' apartments, and helping to clean, cook, and shop. *Id.* He said he had to lift or carry over 100 pounds on a frequent basis, often when he had to help adults move from the bed into a wheelchair. [R. 76]. On an occasional basis, Plaintiff stated that he would have to lift 40 or 50 pounds. *Id.* Plaintiff stated that there were nine staff members in total and twelve patients. *Id.* Plaintiff added that he would spend most of the day, or at least seven hours, on his feet. *Id.* He spent the rest of his day preparing the agenda for staff, writing reports, and preparing information for doctors. *Id.*

The ALJ next moved on to discuss Plaintiff's medical conditions that have prevented him from working. [R. 77]. Plaintiff testified that he has two detached retinas. *Id.* He stated that one occurred at work, and the other had nothing to do with the job. *Id.* Plaintiff said his vision is distorted and he cannot see clearly or figure out what it is he is seeing. *Id.* He added that he also suffers from tinnitus, a hearing problem that is "overbearing" to his daily living. *Id.*

Plaintiff told the ALJ that for his job, he would have to write reports and drive, and he no longer has the same speed that he used to have. [R. 78]. He testified that the tinnitus was overwhelming and caused him to hear a humming, hissing, or ringing sound. *Id.* He also testified that he had prostate and urinary issues. *Id.* Plaintiff testified that he often wakes up to urinate and does not have restful night sleeps. *Id.* As a result, he testified that he is often exhausted in the mornings and has trouble focusing. *Id.* He needs to nap during the day. *Id.*

3

Plaintiff next testified about his back pain. *Id.* He stated that the lower left side of his back has discomfort that makes it so he cannot stand for a long period of time. *Id.* He added that he has difficulty putting his socks on, bending over, and putting on his shoes. *Id.* He stated that he could lift approximately twenty pounds but would separate the weight if he had to lift more than that. [R. 79].

Plaintiff also discussed his depression and anxiety. *Id.* Plaintiff testified that he suffers from anxiety attacks at night, where he wakes up and hyperventilates. *Id.* He stated that at first, he thought it was a heart attack and rushed to the emergency room, but then he understood it was just something that he could not control. *Id.* He added that he recently had a panic attack at a supermarket. *Id.* He testified that the anxiety and depression have caused him to not go out as much as he used to and contribute to his inability to sleep. *Id.* Plaintiff also stated that he has difficulty focusing and concentrating. *Id.* He added that he gets distracted while performing tasks. [R. 80]. Plaintiff told the ALJ that he takes the medication Lipitor, which he believes causes memory loss. *Id.* He added that he does not retain memory like he used too. *Id.*

Plaintiff stated that he was able to see and avoid a door if the door was open. *Id.* He also said he was able to walk on the sidewalk and avoid running into people. [R. 81]. He added that if there was a box on the floor in his office, he is able to avoid walking into the box. *Id.* Plaintiff testified that he had difficulty reading a computer monitor, because the letters constrict and expand, and he cannot see the letters clearly. *Id.* He added that the difficulty persisted even when he was reading a book or a newspaper. *Id.* Plaintiff then told the ALJ that he had last seen his eye doctor in February of 2016. [R. 82].

The ALJ then asked about Plaintiff's anxiety attacks. [R. 81]. Plaintiff testified that the anxiety attacks began before he stopped working. *Id.* He began taking medication for the attacks

as needed. *Id*. At the time of the hearing, he was not seeing anyone for mental health treatment because he did not have insurance which covered it. [R. 82]. He was seeing a primary care physician in West Palm Beach named Dr. Uribe since September 2015. *Id*. Plaintiff testified that he was taking Xanax for his depression and anxiety. [R. 83.] The Xanax was prescribed by his previous doctor, Dr. Comiskey, who he last saw in July of 2015. *Id*. Plaintiff added that he last saw his urologist in March of 2016. *Id*.

The ALJ noted that there was no Residual Functional Capacity ("RFC") from the state level, so he asked Plaintiff to see consultative doctors in internal medicine and psychiatrics and requested RFCs from those physicians. [R. 84].

Next, Susan Lazarus, the Vocational Expert ("VE"), testified. Plaintiff objected to Ms. Lazarus' testimony, arguing that her experience, knowledge, and training was insufficient to determine the number of jobs that might be available in either the national, regional, or local economy. *Id*. The ALJ stated that she understood Plaintiff's objection but that vocational experts, and specifically Ms. Lazarus, had been approved by the Social Security Administration to testify in these types of hearings. *Id*. The ALJ noted that her testimony is part of the hearing requirement, and that she would still consider Ms. Lazarus' testimony. [R. 85].

The VE first asked Plaintiff about his duties at work. [R. 85]. Plaintiff testified that he was a manager who supervised the whole operation, including consumers and staff members. *Id*. He stated that he supervised six employees in a typical day. *Id*. Plaintiff added that he was responsible for hiring and firing in his position, but later HR took over that responsibility. *Id*. Plaintiff stated that he did not need a license for his position. *Id*. The VE noted that Plaintiff was a director of an institution. [R. 86].

Next, the ALJ began questioning the VE. *Id*. The VE described Plaintiff's past work as a

5

director of an institution, with an SVP of 8. *Id.* The VE classified the work as sedentary. *Id.* The

VE added that she thought his work did not rise to the level of 8 because he only managed a

portion of the institution and not the entire institution. [R. 87]. The VE stated that she thought the

work had an exertion level of light as opposed to sedentary. *Id.* The ALJ posed the VE the

following hypothetical:

> "[I]f the Claimant is able to do medium work, which is lift and carry 50 pounds
> occasionally, 25 frequently, stand and walk six hours and sit six hours in the normal
> eight-hour day, he's able to frequently climb ramps and stairs, occasionally ladders,
> ropes, scaffold, able to frequently balance and crawl, occasionally stoop, kneel, crouch,
> must avoid concentrated exposure to hazards such as machinery and heights."

[R. 87]. In response to the hypothetical, the VE stated that Plaintiff would be able to perform his

past work with this RFC "[t]he way it's performed in the *DOT*.... but not the way he performed

it, the way he testified." [R. 88]. The ALJ stated that, "The Claimant has not been able to do past

work." *Id.* The ALJ then asked the VE if Plaintiff had transferable skills, and the VE stated that

Plaintiff has transferrable skills. *Id.* The VE next stated that the skills transferred to the job of a

mental retardation aide in a facility. *Id.* That position is "considered medium with an SVP of 6."

*Id.* The VE stated that there are approximately 14,000 positions of that job nationally. *Id.* The VE

stated that such position would not require additional training or an adjustment period. *Id.* The

VE testified that this was the extent of the jobs that Plaintiff's skills would transfer to. *Id.*

Next, the ALJ asked the VE if adding the following mental limitations to the hypothetical

RFC described above would affect Plaintiff's ability to perform past work:

> "Claimant is able to understand, remember, and carry out detailed but not complex
> instructions, make decisions, and concentrate for an extended period, accept instructions,
> respond appropriately to changes in the routine work and able to interact appropriately
> with supervisors, coworkers, and the public to perform work."

[R. 89]. The VE answered that that the additional mental limitations would mean that Plaintiff

would have to engage in skilled work, similar to the work he did in the past. *Id.* The VE also testified that there would be no transferable skills with the mental limitations, because the job that Plaintiff would have to perform would still require "more mental than what [the] hypothetical has indicated for a demand." *Id.*

The ALJ next looked to the medical source statements from 2014. *Id.* The ALJ posed the following hypothetical:

> "[A]ssume an individual of the Claimant's age, education, and vocational profile. This individual is able to sit for five hours, stand and walk for a combined total of three hours, is able to frequently lift twenty pounds, never climb, able to frequently bend, stoop, crouch, and able to frequently reach above the shoulder. It says will require unscheduled breaks, but I don't see what the limitations are on breaks….[The Mental Medical Source Statement (Exhibit 11F)] says the Claimant has marked limitations in the ability to perform activities of daily living, marked limitations in maintaining social functioning, extreme limitations in concentration, persistence, and pace resulting in failure to complete tasks in a timely manner, extreme limitations and episodes of deterioration or decompensation in a work or work-like setting, which causes the individual to withdraw from the situation or to experience exacerbation of signs or symptoms. And I think that means not able to complete a workweek or workday."

[R. 90]. The ALJ asked the VE if such an individual as described above would be competitive in terms of obtaining and maintaining work in the national economy. *Id.* The VE testified that such an individual would not be able to obtain or maintain work in the national economy.

Plaintiff's counsel then asked the vocational expert several questions. [R. 91]. Counsel asked the VE what data she relied upon to come up with the job numbers. *Id.* The VE stated that she uses Job Browser, a program which uses statistics from the Department of Labor. *Id.* She added that of the 14,000 jobs she mentioned earlier in her testimony, about 75% of those jobs were full-time positions. *Id.* Counsel asked the VE whether Plaintiff's past work had any parts of the job that fell outside of the DOT code. [R. 92]. The VE agreed that the description she gave of Plaintiff's job from the DOT was not perfect and that there was no job which matched his past

7

work exactly. *Id.* She noted that Plaintiff seemed to do more physical work than a typical supervisor. *Id.* She also added that if Plaintiff were performing the job as he testified, and was lifting heavy items frequently, then the work would be classified as heavy. *Id.* She added that she did not think Plaintiff's job was a composite job. [R. 93]. The job of mental retardation aide, which she testified Plaintiff could do, is a medium level job that involves dealing with people, but not lifting heavy items often. *Id.*

The ALJ held a second supplemental hearing on November 28, 2016. [R. 97]. At the second hearing, the ALJ stated that she sent Plaintiff to get an internal medicine and a psychological consultative examination after the initial hearing because he was alleging mental impairments, but he had not seen a mental health professional. [R. 100]. The supplemental hearing was held after the reports were made. *Id.* First, Plaintiff's attorney made a brief opening statement, in which he stated that Plaintiff is a 62-year old individual with two years of college education, and past work as a supervisor of mentally challenged individuals. *Id.* Plaintiff's counsel stated that this was the only job that Plaintiff has performed at the substantial gainful activity level. *Id.* He added that the only earnings that Plaintiff received after his disability onset date were leftover vacation and sick time that he had accumulated from his long-time employment. *Id.* Plaintiff's counsel also stated that Plaintiff reported that he stopped working in May 2010. *Id.* He stated that Plaintiff suffers from various musculoskeletal ailments, prostate issues, vision and hearing deficiencies and severe mental health impairments, and, as a result, has been unable to sustain gainful employment since May 15, 2010, and is disabled pursuant to medical and vocational guidelines 202.06 since age 56. *Id.*

The ALJ noted that the Internal Medicine Consultative Examiner said that Plaintiff could do medium work, including carrying 50 pounds occasionally, 25 pounds frequently, stand for

four hours and sit for four hours. [R. 101]. Plaintiff's counsel stated that the report reflected problems seeing and hearing; specifically humming in both of his ears, and vision problems with diagnosis of bilateral detached retinas, glaucoma, and bilateral cataract extraction. *Id.* The ALJ noted that the 2014 report stated that Plaintiff's vision is 20/50 in the right eye and 20/20 in the left eye, with intact peripheral vision. *Id.* Plaintiff's counsel stated that Plaintiff also suffered from anxiety and depression. *Id.*

Next, the ALJ questioned Mr. Lovely, the vocational expert. [R. 102]. The ALJ first informed the VE that, at the previous hearing, the VE testified that Plaintiff's past relevant work was as an institutional director, which was skilled, and generally performed as sedentary work. [R. 103]. However, the ALJ noted that Plaintiff testified that he actually performed the work at the heavy level. *Id.* The VE agreed with this past relevant work. *Id.* The ALJ then asked the VE if Plaintiff could perform his past work if:

> "Claimant is able to do medium work, which is lift and carry 50 pounds occasionally, 25 frequently, stand four hours, walk four hours, sit four hours, is able to occasionally climb ramps, stairs [sic] as well as ladders, ropes, scaffold, can frequently balance and occasionally stoop and crouch, crawl, must avoid concentrated exposure to hazards, such as machinery and heights, is able to operate foot controls bilaterally."

[R. 103]. The VE testified that Plaintiff would be able to perform his past work, per the DOT, as it was generally performed. *Id.* The ALJ then asked the VE if Plaintiff could perform any past work if, in addition:

> "Claimant is able to understand, remember, carry out simple instruction and make simple decisions, cannot concentrate for an extended period, accept instructions and respond appropriately to changes in the routine work setting, able to interact appropriately with supervisors, coworkers, and the general public, perform work related tasks."

[R. 103-104]. The VE testified that, with the additional mental limitations, Plaintiff would not be able to perform past work. [R. 104]. The ALJ next asked, "with the inability to perform past

work with the mental, would that also affect transferable skills?" *Id.* The VE testified in response that it would affect transferable skills because it is unskilled work. *Id.* Next, the ALJ asked Plaintiff if he was able to manage money, and Plaintiff testified that he was able to manage money. *Id.* The hearing then concluded.

## B. Medical Record Evidence

In reaching his decision to deny Plaintiff's benefits, the ALJ reviewed the medical evidence of record, the relevant portion of which is summarized below.

Between September 11, 2008 and March 20, 2014, Plaintiff presented to Delaware Valley Urology in Mt. Laurel, New Jersey. [R. 305-339, Exhibit 1F]. Plaintiff underwent several lab tests. [R. 309-313, 325-339]. Dr. Scott Asroff, M.D. summed up Plaintiff's medical history regarding his urology issues as follows: Plaintiff presented with benign prostatic hyperplasia ("BPH"), or an enlarged prostate. [R. 314]. Plaintiff's symptoms began gradually and were described as moderate, although they interfered with his daily activities and sleep. *Id.* Plaintiff's symptoms as of March 2014, at the time of Dr. Asroff's report, included incomplete bladder emptying, frequency, and nocturia. *Id.* Plaintiff voided every three hours between waking and bedtime. *Id.* Plaintiff had continued medication for the condition over the years of treatment and his symptoms have not changed. *Id.* At the time of the report, Plaintiff was taking Cardura. *Id.* Over the six-year period, Plaintiff presented to Dr. Asroff for check-ups every two to three months. [R. 307]. Plaintiff also presented to Dr. Asroff for erectile dysfunction. [R. 315].

Between November 4, 2013 and May 5, 2014, Plaintiff presented to James Nachbar, M.D., an ophthalmologist, at South Jersey Eye Physicians in Moorestown, New Jersey. [R. 345-353, Exhibit 3F]. On November 4, 2013, Plaintiff underwent several tests for his eyesight. [R. 347-353]. The doctor's notes are illegible. Plaintiff returned to the office on May 5, 2014 and

underwent more tests. [R. 346]. The doctor's notes are mostly illegible, however, the doctor noted that there had been no change since Plaintiff's November 4, 2013 visit. *Id.* On March 25, 2014, Dr. Nachbar conducted a physical of Plaintiff and issued a medical source statement. [R. 340-344, Exhibit 2F]. Dr. Nachbar wrote that he had periodically examined Plaintiff since 2008. [R. 342]. Plaintiff had previously presented with detached retinas and glaucoma. *Id.*

Between June 30, 2008 and July 17, 2014, Plaintiff presented to Harry Cantrell, M.D., an ear, nose and throat specialist in Voorhees, New Jersey. [R. 354-364, Exhibit 4F]. Plaintiff first presented to Dr. Anthony Cultrara, M.D. on June 30, 2008, complaining of a swollen gland. [R. 356]. Dr. Cantrell noted that Plaintiff was evaluated for a right parotid gland cyst seen on an ultrasound of his neck. *Id.* Plaintiff stated that he had one episode of swelling which had since subsided. *Id.* He denied any facial pain, xerostomia, history of Sjogrens or sarcoid. *Id.* The doctor categorized the symptoms as chronic, noted that the symptoms persisted for three weeks, and called the severity moderate. *Id.* The doctor performed a diagnostic nasopharyngoscopy/laryngoscopy. [R. 358]. The nasopharynx was clear of any masses, exudate, or bleeding. *Id.* The eustachian tube orifices were found to be patent, and the base of the tongue, valleculae, pharyngeal walls and pyriform sinuses were all free of disease. *Id.* The doctor wrote that his assessment was neoplasm of uncertain behavior of major salivary glands and swelling, masses or lumps in the head and neck. *Id.* The doctor reviewed Plaintiff's CT scan which showed a four-millimeter cyst in the right parotid which is not palpable. *Id.* The doctor recommended following up in six months with an ultrasound and to discuss further imaging if there was a change. *Id.* The doctor also noted that Plaintiff had some thickening of the maxillary sinuses and a retention cyst, but that Plaintiff was asymptomatic and did not require treatment at that time. *Id.*

11

Plaintiff returned to the office on June 19, 2014, complaining of tinnitus. [R. 361]. He presented to Dr. Cantrell. *Id.* Plaintiff described a humming noise in both ears. *Id.* Plaintiff said that the noise is moderately intrusive and symptomatic only while lying down. *Id.* The doctor noted that the onset of tinnitus was sudden and may have been associated with exposure to loud noise. *Id.* Plaintiff told the doctor that he was exposed to loud music for seven days and he had attended a loud jazz concert. *Id.* He said he had no other symptoms and reported no aggravating factors. *Id.* Upon physical examination, Plaintiff appeared normal. *Id.* Dr. Cantrell assessed that Plaintiff had tinnitus and ordered a tympanometry and reflex threshold, and a comprehensive audiometry evaluation/speech recognition [R. 363]. Dr. Cantrell noted that there was a bilateral slight dip at 4k, c/w noise exposure. *Id.* Dr. Cantrell counseled loud noise protection. *Id.*

Plaintiff returned to Dr. Cantrell for a follow-up on August 14, 2014. [R. 443-445, Exhibit 9F]. He reported that the ringing and hissing noise in his ears had worsened. [R. 443]. Plaintiff stated that the tinnitus was causing anxiety and depression. *Id.* Dr. Cantrell noted that the tinnitus was "just a sign of a deeper mental issue." *Id.* Dr. Cantrell assessed Plaintiff as having tinnitus and depression. [R. 444].

Plaintiff presented to Dorfner Family Medicine, his primary care provider, in Willingboro, New Jersey, on several occasions between May 7, 2009 and July 22, 2014. [R367-434, Exhibits 6F and 7F]. In the general medical report, Susan Nulin, MA, noted that Plaintiff was diagnosed with GERD, asthma, BPH, hyperlipidemia, ED, and glycemia. [R. 374]. On May 11, 2009, Plaintiff underwent a Dexascan. [R. 431]. Dr. Michael Brodsky, M.D., found that Plaintiff had osteopenia. On October 26, 2009, Plaintiff received an x-ray of his neck and face due to swelling. [R. 426]. Dr. Fred Schlesinger, M.D., observed a hypoechoic lesion that was likely a cyst. *Id.* In 2010, Plaintiff received x-rays of his hip after he complained of hip pain.

[R. 424-425]. There was no fracture, dislocation, or abnormal joint space narrowing. [R. 424]. The doctor noted an irregular area of increased bone density at the lesser trochanter, which might represent a small bone island. [R. 425].

On October 22, 2014, Walter Comiskey, D.O., filled out a Medical Source Statement for Plaintiff regarding his physical abilities, his anxiety, and his depression. [R. 447-459, Exhibits 10F, 11F, and 12F]. Dr. Comiskey wrote that Plaintiff suffers from anxiety, panic attacks, palpitations, and tinnitus. [R. 447]. He noted that the prognosis was fair. *Id.* He listed the following symptoms: vertigo, fatigue, fear, insomnia. *Id.* He wrote that Plaintiff's symptoms are constantly so severe as to interfere with performing simple work-related tasks. *Id.* He opined that Plaintiff could sit for five hours in an eight-hour work day, stand for one hour, and walk for two hours. *Id.* Dr. Comiskey also noted that Plaintiff had difficulty driving. *Id.* He opined that Plaintiff had no limitations in repetitive reaching, handling, or fingering. [R. 448]. He wrote that Plaintiff could frequently lift and carry 11-20 pounds, frequently bend, squat, crawl, and reach above shoulder level, but never climb. [R. 449]. Dr. Comiskey further opined that Plaintiff required mild restrictions of exposure to marked changes in temperature and humidity and mild restrictions of exposure to dust, fumes, and gases. *Id.* He also wrote that Plaintiff will need unscheduled breaks during an eight-hour work day due to overwhelming fear and anxiety. *Id.*

In the Medical Source Statement regarding anxiety filled out on October 22, 2014, Dr. Comiskey wrote that Plaintiff exhibited generalized persistent anxiety in addition to apprehensive expectation and vigilance and scanning. [R. 452]. He also wrote that Plaintiff exhibited a persistent irrational fear of a specific object, activity or situation resulting in a compelling desire to avoid the dreaded object, activity, or situation. *Id.* He stated that Plaintiff experienced recurrent severe panic attacks manifested by a certain unpredictable onset of intense

13

apprehension, fear, terror, and sense of impending doom at least once a week. *Id.* Dr. Comiskey opined that Plaintiff had marked restriction of daily living, marked difficulties maintaining social functioning, extreme deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and extreme episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs or symptoms. [R. 453]. He also noted that Plaintiff needs to have counseling. [R. 454].

In the Medical Source Statement regarding depression filled out on October 22, 2014, Dr. Comiskey opined that Plaintiff presented a disturbance of mood accompanied by full or partial depressive syndrome; and that the depressive syndrome was characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbances and weight changes, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. [R. 456]. Dr. Comiskey opined that due to Plaintiff's mental disorder, Plaintiff suffered from extreme restriction of daily living, extreme difficulties in maintaining social functioning, extreme deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and extreme episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs or symptoms. [R. 458].

Between October 22, 2015 and March 17, 2016, Plaintiff presented to Palm Beach Urology Associates, PA. [R. 462-483, Exhibits 14F and 15F]. On November 6, 2015, Plaintiff presented to Damian Portela, M.D., at Palm Beach Urology Associates, P.A., with symptoms of an enlarged prostate. [R. 469]. Plaintiff said that his symptoms have gotten worse over the last year, and he gets up four times during the night to urinate. *Id.* Plaintiff stated he has normal

sensation when needing to urinate, but he has problems getting his urine stream started. *Id.* Dr. Portela assessed Plaintiff as having benign prostatic hyperplasia ("BPH") with obstruction, enlarged prostate with lower urinary tract symptoms, and nocturia. [R. 471]. He also scheduled a flexible cystoscopy and urodynamics. *Id.* Dr. Portela noted that he talked with Plaintiff at length about medical treatment of BPH with obstruction. *Id.* They discussed alternative medical, minimally invasive and surgical options. *Id.* They also discussed options like alpha blocker therapy, and Plaintiff gave full informed consent to proceed with medical therapy for BPH. *Id.* Included in the doctor's records was a list of Plaintiff's prescriptions, which include Xanax, Lipitor, Symbicort, Aspirin, Doxazosin, Oxybutynin, Xalatan, and vitamins. [R. 482].

Plaintiff presented to Meir Baalhaness at Visual Health in Palm Springs, Florida, on November 6, 2015. [R. 484-489, Exhibit 16F]. Plaintiff presented with a chief complaint of blurred vision in both eyes. [R. 487]. The blurred vision was recurring and associated with floaters, and it was moderate in severity. *Id.* Plaintiff indicated that his right eye was worse than his left, and that the blurred vision was relieved by blinking. *Id.* Dr. Baalhaness noted that Plaintiff had a history of retinal detachment and scheduled him for tests in six months. [R. 488]. Dr. Baalhaness also noted that Plaintiff has ocular hypertension and wanted Plaintiff to follow up to determine if he had glaucoma. *Id.*

Dr. Steven L. Kanner, D.O., completed an examination of Plaintiff on May 12, 2016 and completed a Consultative Examination Report. [R. 490-499, Exhibit 17F]. Dr. Kanner noted that Plaintiff stated he cannot work for multiple reasons, and that he cannot sleep at night. [R. 491]. Dr. Kanner noted that Plaintiff has an enlarged prostate and had surgery but urinates every hour. *Id.* As a result, Plaintiff states he cannot rest properly and this affects his memory and his focus on tasks. *Id.* Plaintiff also stated that his vision was diminished in his right eye, and he had lower

15

back and left flank pain. *Id.* Plaintiff also noted shortness of breath after walking one to two blocks and occasional wheezing. *Id.* Plaintiff was taking the following medications: Xanax, Lipitor, Symbicort, aspirin, Flomax, prevacid, and oxybutynin. *Id.* Plaintiff told Dr. Kanner that he had dyslipidemia, and past surgery for retina issues, bilateral cataracts, appendectomy, cholecystectomy, and TURP. *Id.* Plaintiff was alert, oriented and in no acute distress. [R. 492]. Plaintiff was appropriately attired and cooperative, demonstrating a flat affect. *Id.* Plaintiff's vision was 20/50 in the right eye and 20/20 on the left eye, corrected. *Id.* Plaintiff had intact peripheral vision. *Id.* Dr. Kanner also noted that Plaintiff had no difficulty in arising from a chair to the standing position and initiating ambulation. [R. 493]. Dr. Kanner noted that when Plaintiff walked, his ambulation was normal. *Id.* Plaintiff could walk on his toes and heels with little difficulty. *Id.* Dr. Kanner noted that Plaintiff's physical exam was normal. *Id.* Plaintiff complained of occasional wheezing and shortness of breath, but his pulmonary exam was normal. *Id.* He complained of lower back pain but presented full range of motion of his lower back with no motor reflex or sensory deficits corresponding to any disc group. *Id.* Plaintiff stated that he could not concentrate and had diminished memory due to his inability to sleep, but Dr. Kanner noted that Plaintiff was able to give him an excellent history. *Id.* He opined that Plaintiff can sit, stand, walk, lift, carry and handle objects without difficulty. *Id.* He added that Plaintiff's memory was intact, and he interacted well during his interview. *Id.*

Dr. Kanner also completed a medical source statement of Plaintiff's ability to do work-related activities (physical). [R. 494]. Dr. Kanner opined that Plaintiff could occasionally lift 51 to 100 pounds, frequently lift 21 to 50 pounds, and continuously lift up to 20 pounds. *Id.* He added that Plaintiff could occasionally carry 51 to 100 pounds, frequently carry 21 to 50 pounds, and continuously carry up to 20 pounds. *Id.* He opined that Plaintiff could sit, stand, or

walk for a total of two hours at one time without interruption, and that he could sit, stand, or walk for four hours total in an eight-hour work day. [R. 495]. Dr. Kanner wrote that Plaintiff could only sit or stand for two hours at a time. *Id.* He noted, "exam normal by history states pain will be exacerbated" and wrote that Plaintiff did not need a cane. *Id.* Dr. Kanner wrote that Plaintiff could continuously use his right and left hands for reaching, handling, fingering, feeling, and pushing/pulling. [R. 496]. He also said that Plaintiff could continuously operate foot controls. *Id.* Dr. Kanner wrote that Plaintiff could only occasionally climb stairs or ramps, climb ladders or scaffolds, stoop, kneel, crouch, and crawl, because performing these activities exacerbate pain. [R. 497]. He added that none of Plaintiff's impairments impacted his vision or hearing. *Id.* He stated that Plaintiff could continuously tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes and irritants, extreme cold and heat, vibrations and the sound of a jackhammer. [R. 498]. Dr. Kanner also opined that Plaintiff could perform activities like shopping; could travel without a companion; ambulate without a wheelchair, crutches, walker, or a cane; walk a block at a reasonable pace on uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for his own personal hygiene; and sort, handle or use paper/files. [R. 499].

Between July 23, 2015 through April 27, 2016, Plaintiff presented to Tenet Florida Physician Services. [R. 500-522, Exhibit 18F]. Plaintiff filled out his own medical history form, and listed cholesterol, asthma, and prostate BPH as chronic medical conditions. [R. 503]. He noted that he had surgery in both eyes for detached retina, and he had his appendix and gallbladder surgically removed. *Id.* Plaintiff noted that he exercised daily by walking, drank caffeinated drinks three times daily, very rarely drank alcohol, never smoked, and never used

recreational drugs. *Id.*

On October 21, 2015, Plaintiff presented to Dr. Leon Uribe, M.D. [R. 514]. Plaintiff presented for prostate issues, vision issues, and anxiety. *Id.* Dr. Uribe wrote that Plaintiff's prostate problems had begun eight years earlier and were reported as moderate. *Id.* Plaintiff reported that his symptoms occur constantly. *Id.* Plaintiff also reported severe vision issues, including constant symptoms. *Id.* Dr. Uribe wrote that the location is bilateral, that Plaintiff has retinal detachment bilaterally, and that he needed an ophthalmology referral. *Id.* Finally, Plaintiff presented for anxiety. *Id.* Dr. Uribe wrote that his symptoms are stable, with improvement of initial symptoms. *Id.* He sometimes took alprazolam. *Id.* Plaintiff reported functioning as "not difficult at all," and he did not present with thoughts of death or suicide. *Id.* Dr. Uribe assessed Plaintiff as having benign non-nodular prostatic hyperplasia with lower urinary tract symptoms and discussed lifestyle modifications including exercise and dietary changes. [R. 517]. He referred Plaintiff to a urologist. *Id.* Dr. Uribe also assessed Plaintiff as having retinal detachment in both eyes with multiple retinal tears and referred him to an ophthalmologist. *Id.* He assessed Plaintiff as having generalized anxiety disorder but did not refill his prescription for Alprazolam and counseled Plaintiff on the addictive nature of the medicine. *Id.* Finally, Dr. Uribe assessed Plaintiff as having mixed hyperlipidemia. *Id.*

Plaintiff returned to Dr. Uribe on April 27, 2016. [R. 519]. He presented for hyperlipidemia, asthma, and anxiety. *Id.* Dr. Uribe noted that Plaintiff's hyperlipidemia was stable, and that Plaintiff was due for labs, and needed a refill on Atorvastatin. *Id.* He also noted that Plaintiff's asthma was stable, and that Plaintiff told him the Symbicort worked well, but it was expensive to take. *Id.* In regard to Plaintiff's asthma, Dr. Uribe noted that that Plaintiff's symptoms were stable, Plaintiff reported functioning as not difficult at all, and presented no

thoughts of death or suicide. *Id.* Plaintiff also requested an Alprazolam refill and said he takes the pill three times per week. *Id.*

On May 21, 2016, Dr. Eugene Herrmann, Ph.D., conducted an examination and prepared a Medical Source Statement of Ability to Do Work-Related Activities (Mental) [R. 523 – 532, Exhibit 19F]. Dr. Herrmann opined that Plaintiff's ability to understand, remember, and carry out instructions were affected by his mental impairment. [R. 524]. Dr. Herrmann wrote that Plaintiff had no restriction in understanding and remembering simple instructions, carrying out simple instructions, and making judgments on simple work-related decisions, but had moderate restrictions in understanding and remembering complex instructions, carrying out complex instructions, and in his ability to make judgments on complex work-related decisions. *Id.* Dr. Herrmann noted that, "Mr. Lopez presents with deficits in attention and concentration and memory deficits – likely associated with anxiety and depression." *Id.* Dr. Herrmann also opined that Plaintiff's ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in a routine work setting were moderately affected by his impairment. [R. 525]. Dr. Herrmann wrote that Plaintiff's anxiety, depression, and social withdrawal all supported his assessment. *Id.* He also noted that there were no other capabilities affected by Plaintiff's impairment, and that Plaintiff can manage benefits in his own best interest. *Id.*

Dr. Herrmann conducted the psychological evaluation of Plaintiff on May 21, 2016. [R. 527]. Plaintiff reported that he was applying for social security disability benefits due to "difficulties with vision," tinnitus, and anxiety. *Id.* Dr. Herrmann conducted a clinical interview with a mental status examination, and he reviewed Plaintiff's available medical records. *Id.* Dr. Herrmann reported the following background information: Plaintiff arrived on time to the appointment and was driven by his wife. [R. 528]. He appeared to be a reliable historian. *Id.*

19

Plaintiff has been married for 33 years and lived with his wife. *Id.* He completed 14 years of education and denied any history of special education. *Id.* He was last employed in 2010 as a supervisor in a "residential setting" for individuals who were "mentally challenged." *Id.* Plaintiff was responsible for supervising 10 to 11 staff members and worked there for 25 years. *Id.* Plaintiff told Dr. Hermann that he had worked all his life, and he had to stop working because he "wouldn't be able to sleep, wasn't functional, couldn't do what was expected, wasn't productive," and was unable to drive to work due to his vision problems. *Id.*

Plaintiff reported that at some time in 2010, he was struck in the face by a patient which impacted his vision and damaged his retina. *Id.* Plaintiff reported that he cannot see at night and has poor vision in the daytime. *Id.* Plaintiff further reported that he has an enlarged prostate which affects his sleep on a nightly basis, and his lack of sleep interrupts his reasoning and focus. *Id.* He reported to Dr. Herrmann that he once lost consciousness in the bathroom but did not seek medical treatment. *Id.* He stated he experienced occasional back pain, and sometimes cannot bend to put on socks or underwear. *Id.* Plaintiff also reported that he experiences ringing, throbbing, and hissing as part of the tinnitus in both ears. *Id.* Plaintiff stated that he had been treated by a psychologist, Dr. Rogers, over the course of 2015, and he had taken Xanax over the course of 2015. *Id.* However, Plaintiff denied any history of inpatient treatment or suicide attempts. [R. 529]. He said he started experiencing panic symptoms a few years ago, which caused him to hyperventilate and worry that he was having a heart attack. *Id.* He went to the Emergency Room a few times fearing a heart attack, but it was a panic attack. *Id.* The most recent episode of panic symptoms was 6 days before the instant evaluation. *Id.*

Dr. Herrmann then conducted a mental status examination and discussed the following: Plaintiff presented as neatly dressed and demonstrated good hygiene. *Id.* Plaintiff's gait was

normal, eye contact was appropriate, and psychomotor activity was normal. *Id.* Plaintiff's behavior was appropriate, and he related well to Dr. Herrmann. *Id.* Plaintiff was alert, and oriented to time, place, and person. *Id.* When asked about the evaluation, Plaintiff explained that the purpose was to "express reasons not being functional [sic]" and that it had been ordered by the judge. *Id.* Plaintiff's speech was normal in rate, tone, volume, and fluency, and there was no evidence of pressured speech or racing thoughts. *Id.* Dr. Herrmann reported that Plaintiff's thought process was logical and goal-directed without any evidence of loosening of associations. *Id.*

However, Dr. Herrmann found that Plaintiff demonstrated attention and concentration deficits. [R. 530]. Plaintiff had difficulty with regard to completing serial 7's, spelled "world" backwards with some difficulty and recited the days of the week backward. *Id.* Plaintiff's task persistence was average, and he responded appropriately to questions throughout the interview. *Id.* Plaintiff did not appear to be easily distracted. *Id.* Plaintiff was able to recall social history including the name of his high school. *Id.* His immediate memory was fair, and he could repeat five digits forward and three digits backwards. *Id.* Plaintiff demonstrated mild deficits in recent memory when recalling only two of three items after close to a ten-minute delay. *Id.* He demonstrated mild remote memory deficits when recalling three of the four recent presidents. *Id.* Plaintiff demonstrated good judgment and insight, and stated that if he found a stamped, addressed, and sealed envelope, he would try to mail it. *Id.* He said that if he smelled smoke in a crowded movie theater, he would know what the smoke was and try to warn people. *Id.* Dr. Herrmann reported that his abstract thinking was below average, and when asked to describe how a bus was similar to a bicycle, he said they both had rotating wheels and that apples and bananas are both fruits. *Id.*

Plaintiff's general fund of information was below average. *Id.* He reported that the sun sets in the east, not the west, but he identified several historical figures. *Id.* Plaintiff reported that his mood was often anxious with a history of panic attacks. *Id.* Plaintiff indicated that he had been sad "a little bit," and would "think too much" and isolate himself. *Id.* Dr. Herrmann noted that his affect was appropriate without overt signs of psychological distress and his appetite was normal. *Id.* Plaintiff stated he would sometimes wake up at night with panic symptoms. *Id.* Plaintiff denied hallucinations or delusions and there was no reported history of obsessive compulsive behavior or phobias. *Id.* Plaintiff described himself as analytical. *Id.*

Dr. Herrmann next discussed Plaintiff's daily activities. *Id.* Plaintiff reported difficulty putting on his socks and underwear because he occasionally felt pain on his left side, but he did not require any assistance getting dressed, bathing, or feeding himself. *Id.* He prepared meals, completed household chores including sweeping, mopping, and laundry, and he went to the grocery story on a regular basis. [R. 531]. Plaintiff used to enjoy dancing with his wife on Saturdays, but he no longer had any interest in doing this or in mingling with others. *Id.* Plaintiff reported that he is not the person he used to be. *Id.* Dr. Herrmann opined that he presented with symptoms of depression and anxiety that would prevent him from maintaining full time employment at the time of the evaluation. *Id.* He opined that Plaintiff would have difficulty interacting with coworkers and coping with the stress associated with an average work setting. *Id.* Dr. Herrmann also wrote that Plaintiff would have difficulty completing job tasks over an extended period. *Id.* Dr. Herrmann found that Plaintiff was competent to manage his own personal finances. *Id.* He diagnosed Plaintiff as having panic disorder based on his history of anxiety, panic symptoms, and his trips to the ER, and with adjustment disorder with depressed mood, based on his history of depression associated with psychosocial stressors and reported

22

health problems. *Id.* Dr. Herrmann wrote that Plaintiff was not considered to be able to maintain full time employment at the time of examination due to anxiety symptoms, and his prognosis was guarded because it did not appear that his health problems would improve in the future. [R. 532]. Dr. Herrmann recommended individual psychotherapy to help improve his coping skills. *Id.*

Between August 27 and August 28, 2016, Plaintiff was admitted to the Emergency Room at Good Samaritan Medical Center in West Palm Beach, Florida. [R. 533-548, Exhibit 20F]. He was admitted with a urinary problem. [R. 538]. He was seen by Mark Polsky, D.O. *Id.* He presented with problems stemming from a urinary tract infection. [R. 542].

Plaintiff presented to Visual Health between June 23, 2016 and September 15, 2016. [R. 549-555, Exhibit 21F]. Plaintiff presented on June 23, 2016 for a follow-up visit related to glaucoma. [R. 550]. Plaintiff complained of blurred vision, dry eye, and floaters, flashes, and double vision, and said that the symptoms are moderate in severity. *Id.* Dr. Coffman, M.D., wrote that Plaintiff's condition remained unchanged since his last visit. *Id.* Plaintiff took eyedrops for the glaucoma. [R. 551]. Dr. Coffman also counseled Plaintiff on his pseudophakia and his eyelid cyst. *Id.*

Plaintiff returned on September 15, 2016 to follow up with Dr. Coffman on his glaucoma. [R. 553]. His symptoms were blurred vision and were mild in severity. *Id.* Plaintiff stated that his vision seemed to "jiggle". *Id.* Plaintiff was counseled regarding his posterior capsular opacification and his pseudophakia. [R. 554]. He was told to continue using drops for his glaucoma. *Id.*

Between October 21, 2015 and September 1, 2016, Plaintiff presented to Tenet Florida Physician Services to see his primary care doctor, Leon C. Uribe, M.D., and other doctors to whom Plaintiff was referred by Dr. Uribe. [R. 561-582, Exhibit 23F]. Plaintiff presented to Dr.

Uribe on April 27, 2016 for hyperlipidemia, asthma and anxiety. *Id.* He was prescribed Alprazolam. [R. 567]. Plaintiff returned on September 1, 2016 to Dr. Uribe for a urinary tract infection ("UTI"). [R. 563]. He was given antibiotics. *Id.*

On January 24, 2014, Plaintiff filled out a Disability Report – Adult. [R. 199-210, Exhibit 1E]. Plaintiff listed the following conditions which limited his ability to work: two detached retinas, macular degeneration, glaucoma, enlarged prostate, and chronic headaches. [R. 200]. He wrote that he stopped working because of his conditions. *Id.* Plaintiff stated that he often had to lift heavy things for work and that he was both a supervisor and lead worker. [R. 202]. Plaintiff wrote that he had asthma, that he had to go to the bathroom every five minutes, and he had very limited vision which made it so that he could not drive at night or look at a computer for a very long time. [R. 210].

On March 17, 2014, Plaintiff's wife completed a Function Report – Adult. [R. 222-232, Exhibit 3E]. Plaintiff's wife wrote that Plaintiff lived in a house with her, and he takes care of his personal hygiene, prepares breakfast, feeds the dog and birds, completes daily chores like cleaning and cooking, goes out for groceries and medication at the supermarket, and tries to keep active as much as possible to help with his medical concerns. [R. 225]. Plaintiff's wife wrote that he helps take care of his pets with his wife and that he has no problem with personal care. [R. 226]. She added that he can prepare his own complete meals and does so daily. *Id.* She also wrote that he can clean, do laundry, and iron. *Id.* Plaintiff's wife said he goes outside daily. *Id.* Plaintiff's wife noted that he can walk to places, drive to places, and he can go out alone. [R. 228]. She wrote that he could pay bills and use a checkbook. *Id.* His hobbies include listening to music and watching tv, and he does this daily. *Id.* She stated that he has limited his reading since his eye problems began. [R. 229]. Plaintiff's wife wrote that he has no problems getting along

with family, friends, or neighbors, but he does not like to do any activities in the evening. *Id.* Plaintiff's wife added that he can walk a half mile before needing to stop and rest. [R. 230]. She also noted that he can pay attention for several hours, can finish what he starts, but has a limited ability to follow written instructions. *Id.* She wrote that he gets along with authority figures extremely well. [R. 231]. She wrote that Plaintiff has noticed an increase in anxiety and the fear of losing his sight. *Id.*

On June 17, 2014, Plaintiff filled out a Disability Report-Appeals. [R. 235-240, Exhibit 6E]. Plaintiff wrote that his condition had become more severe since his last disability report. [R. 235]. In this report, Plaintiff wrote that he cannot drive at night due to poor night vision. [R. 254]. He said he needs someone to accompany him if he is traveling long distances. [R. 255]. He also wrote that his vision problems affected his concentration because he says everything appears distorted, there are "double wiggling signs," floaters, and sensitivity to light. [R. 256]. Finally, Plaintiff wrote that his "quality of life has been interrupted socially and intimately for the past four years due to losing employment due to medical issues." [R. 258].

On June 11, 2014, Dr. James Paolino, M.D. conducted a Disability Determination and Transmittal of Plaintiff. [R. 106-112, Exhibits 1A, 2A]. Dr. Paolino found that there was no evidence of a severe medical impairment and found that Plaintiff was not disabled. [R. 109]. On September 10, 2014, Saima Ahmad conducted a second Disability Determination Explanation and Transmittal. [R. 113-121, Exhibits 3A, 4A]. She also found that Plaintiff's medical conditions were not severe, and that Plaintiff was not disabled. [R. 119].

## C. ALJ's Decision

The ALJ issued her decision on Plaintiff's Claim for benefits on April 5, 2017. [R. 10-25]. The ALJ explained the five-step sequential evaluation process for determining whether

an individual is disabled. [R. 11-12]. She then made the following findings of fact and conclusions of law: Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2016. [R. 12]. Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of May 15, 2010, through September 30, 2016. *Id.*

The ALJ found that Plaintiff had a severe impairment, that is disorders of the urinary tract. (20 CFR 404.1520(c)). The ALJ declined to find that Plaintiff's mild bilateral glaucoma, tinnitus, and anxiety/depression were severe, pointing to a March 25, 2014 general medical report which stated that Plaintiff had only minor changes in his vision fields and no conditions that limited his ability to do work-related activity. [R. 13, Exhibit 2F]. She stated that treatment records dated June 6, 2014 show that Plaintiff reported going to Philadelphia for a concert without noting any visual problems. [R. 13, Exhibit 7F]. Plaintiff admitted on December 4, 2015 that his vision was moderate in severity and relieved by blinking. [R. 13, Exhibit 18F]. The ALJ also pointed to a May 12, 2016 physical where Plaintiff reported diminished vision in his right eye but admitted to bilateral cataract surgery. [R. 13, Exhibit 17F]. An examination revealed corrected vision of 20/50 in the right eye and 20/20 in the left eye, and intact peripheral vision. *Id.* The ALJ also noted that Plaintiff suffered with glaucoma for more than twenty years but was still able to work for a majority of that time. *Id.*

The ALJ next rejected Plaintiff's claims of low back pain and tinnitus as severe impairments, because an examination revealed full range of motion of Plaintiff's lower back with no motor, reflex, or sensory deficits; negative straight leg raising test; full range of motion in all joints without inflammation or arthritic changes; and normal gait. [R. 13]. Plaintiff's hearing was also noted as excellent. *Id.* The ALJ noted that the physical residual function capacity of Plaintiff reflected his ability to occasionally lift up to 100 pounds, sit for two hours uninterrupted for a

total of four hours in an eight-hour workday, stand for two hours uninterrupted for a total of four hours in an eight-hour work day, and walk for two hours uninterrupted for a total of four hours in an eight-hour work day. *Id.* Plaintiff was assessed capable of continuous reaching, fingering, and feeling, occasional postural activities, and no balancing. [R. 13, Exhibit 17F].

The ALJ pointed to June 19, 2014 records which showed that despite concerns of tinnitus, the external ears were intact and the otoscopic exam was within normal limits. [R. 13, Exhibit 4F]. Treatment notes dated August 14, 2014 conveyed that despite Plaintiff's report of hissing in his ears, the examination showed that his hearing was intact for conversational voices and the external ears were intact and the otoscopic exam was within normal limits. [R. 14, Exhibit 9F]. Plaintiff's physical exams in 2016 were unremarkable. [R. 14, Exhibit 23F]. The ALJ pointed to records which showed that Plaintiff had glaucoma, but the symptoms were mild, and he was taking eyedrops. [R. 14, Exhibit 21F]. At the hearing on April 13, 2016, Plaintiff testified that he was able to see and avoid a door if it was open, could walk on a sidewalk and avoid running into people, and could avoid boxes if they were on the floor. [R. 14]. The ALJ also noted that Plaintiff had not seen a vision doctor since February 2016. *Id.*

The ALJ next considered the October 22, 2014 medical source statement completed by Walter Comiskey, D.O, which consisted mainly of checked boxes. [R. 14, Exhibits 11F and 12F]. While Dr. Comiskey opined that Plaintiff had marked or extreme limitations in functioning secondary to depression and anxiety, the ALJ noted that the statement was not accompanied by any treating notes, appears to be based solely on Plaintiff's statements, and is not supported by the overall medical evidence record. [R. 14, Exhibit 10F]. Further, the ALJ noted that neither Dr. Comiskey's area of practice nor his relationship to Plaintiff was shown. *Id.*

The ALJ wrote that October 21, 2015 treatment records reflect Plaintiff's reported

improvement of his initial anxiety symptoms with stable related symptoms. *Id.* The ALJ pointed to notes which stated: "The patient reports functioning as not difficult at all." *Id.* The examination notes stated that he was fully oriented with appropriate mood and affect. [R. 14, Exhibit 18F]. The April 27, 2016 treatment notes convey that Plaintiff reported this his anxiety symptoms were stable, his functioning was not difficult at all, and he was fully oriented with appropriate mood and affect. [R. 14, Exhibit 23F]. The ALJ noted that when Plaintiff reported an inability to concentrate and diminished memory at his May 12, 2016 physical, he was also able to give the examiner an excellent medical history, and the examiner assessed Plaintiff's memory as intact and noted that he interacted well during the interview. [R. 14, Exhibit 17F]. The examiner also noted that Plaintiff could sit, stand/walk, lift/carry, and handle objects without difficulty. *Id.*

The ALJ next discussed Plaintiff's psychological evaluation which took place on May 21, 2016, where Plaintiff was diagnosed with panic disorder and adjustment disorder. [R. 14, Exhibit 19F]. The ALJ noted that the diagnosis appeared to be based on Plaintiff's allegations of disabling symptoms, such as an inability to maintain employment due to anxiety and depression, which the ALJ found not supported by other evidence in the record, specifically Exhibit 18F and 17F. [R. 14]. The ALJ found that the record reflected that, at the examination, Plaintiff was fully oriented, did not appear easily distracted, had only mild memory deficits, had logical and goal-directed thought processes, demonstrated good insight and judgment, did not appear delusional, did not appear to have pressured speech or racing thoughts, and denied any suicidal or homicidal ideation or hallucinations. [R. 14, Exhibit 19F]. The ALJ also noted that Plaintiff reported no difficulty performing activities of daily living. *Id.* The ALJ also found that there was no evidence indicating Plaintiff sought treatment at an emergency room for anxiety or

depression, or that he was hospitalized due to his psychological symptoms. [R. 14]. She noted that the hospital records from his August 28, 2016 visit to the Good Samaritan Medical Center document that Plaintiff was anxious but also state that he did not take medications at home and he was not prescribed any medications. [R. 14, Exhibit 20F]. The ALJ wrote that Plaintiff testified at the April 13, 2016 hearing that his primary care doctor had been prescribing medication for panic attacks while he was working, which he had taken as needed. [R. 14-15]. The ALJ wrote that although Plaintiff testified to difficulty focusing and concentrating and diminished memory, he also admitted that he was not seeing anyone for mental health treatment, which suggests the symptoms were not as severe as Plaintiff alleges. [R. 15].

The ALJ found that Plaintiff's medically determinable impairment of anxiety/depression did not cause more than minimal limitation in his ability to perform basic mental work activities and therefore is non-severe. *Id* In making this determination, the ALJ considered the four broad functional areas listed in Section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart B, Appendix 1), also known as the "paragraph B" criteria. *Id.* The ALJ found that Plaintiff had no limitation in understanding, remembering, or applying information; in interacting with others; in concentrating, persisting, or maintaining pace; in adapting or managing oneself; and no episodes of decompensation which have been of extended duration. *Id.* The ALJ pointed to Plaintiff's ability to perform self-care and household chores, his talks with his neighbors and lack of problems getting along with family and friends, as well as the fact that Plaintiff presented as analytical and demonstrated only minor memory defects to support these conclusions. *Id.* The ALJ wrote that the limitations identified using the "paragraph B" criteria were considered in assessing Plaintiff's residual function capacity. *Id.*

The ALJ concluded, after careful review of the entire record, that, through the date last

insured, Plaintiff had the RFC to lift and carry 50 pounds occasionally and 25 pounds frequently, stand for four hours out of an eight-hour workday, walk for four hours out of an eight-hour workday, sit for four hours out of an eight-hour workday, frequently balance, occasionally climb, stoop, kneel, crouch, crawl, and operate foot controls bilaterally, but should avoid hazardous machinery and unprotected heights. [R. 16]. In making this finding, the ALJ wrote that she had considered all the symptoms and the extent to which these symptoms can reasonably be expected as consistent with the objective medical record evidence and other evidence, based on the requirements of 20 CFR 401.1529 and SSR 96-4p, as well as the opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, and 06-3p. *Id.*

The ALJ went through the two-step process in which she must first determine whether there is an underlying medically determinable physical or mental impairment that could be reasonably expected to produce Plaintiff's pain or other symptoms, and then evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit Plaintiff's functional limitations. *Id.* In going through this process, the ALJ summarized the testimony at the hearing and found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms are not consistent with the medical evidence and other evidence in the record. [R. 17]. Regarding Plaintiff's BPH, the ALJ noted that treatment records listed symptoms as moderate in severity and improved with adjustment in medication and treatment. [R. 17, citing Exhibit 1F, 15F, 20F, and 23F]. The ALJ found that Plaintiff is not so disabled as to preclude all manner of work. [R. 18]. Although Plaintiff reported voiding every three hours despite medication in March of 2014, he admitted he drank many fluids and was comfortable with his symptoms. *Id.* The ALJ also pointed to

Plaintiff's physical, which was unremarkable. [R. 18, Exhibit 1F]. Although Plaintiff reported worsening symptoms in November of 2015, the ALJ noted that, aside from an enlarged prostate, Plaintiff's examination was "essentially benign." [R. 18, Exhibit 23F]. Despite presenting to an ER in August of 2016, the ALJ pointed out that Plaintiff's symptoms were moderate in severity, Plaintiff had no pain, and the examination was "otherwise normal." [R. 18, Exhibit 20F]. The ALJ reasoned that Plaintiff improved with treatment and was discharged in stable condition. *Id.* The ALJ pointed to Plaintiff's follow-up examination in September 2016, where Plaintiff reported improvement and his physical exam remained essentially benign. [R. 18, Exhibit 23F].

The ALJ next considered the opinion evidence and stated that she considered and gave significant weight to the opinion of James Nachbar, M.D., at Exhibit 2F [R. 340-344], because it was "supported by the medical signs and laboratory findings and is consistent with the other evidence in the medical record." [R. 18]. However, the ALJ only gave partial weight to the opinion of Steven Kanner, D.O., at Exhibit 17F [R. 490-499], "inasmuch as it is consistent with the medical evidence of record." *Id.* The ALJ concurred with the finding that Plaintiff is capable of performing more than medium level work. *Id.*

The ALJ gave little weight to the opinions of Walter Comiskey, D.O., in his three Medical Source Statements at Exhibits 10F, 11F, and 12F. [R. 446-459]. The ALJ stated that she gave little weight to Dr. Comiskey's opinion because the Statements consisted primarily of checked boxes on a pre-developed form, failed to provide an explanation or nexus for each disabling limitation stated, were not consistent with documented medical signs and laboratory findings, were not consistent with the evidence in the medical record, and the opinions appeared to be based on Plaintiff's statements and allegations, which were often contradicted by Plaintiff's own statements. [R. 18]. Finally, the ALJ gave little weight to the opinion of Eugene Herrmann,

Ph. D., at Exhibit 19F [R. 523-532], which opinion was that that Plaintiff is unable to maintain full time employment, has difficulty interacting with coworkers, and has difficulty completing tasks. [R. 19]. The ALJ gave this opinion little weight because Plaintiff has acknowledged that he was not receiving mental health treatment, and the opinion was not supported by the overall medical record, but instead appeared to be based solely on Plaintiff's allegations. *Id.* The ALJ also pointed out that Dr. Herrmann made a determination of disability in his findings, which is a decision reserved solely for the Commissioner pursuant to 20 CFR 404.1527(c). *Id.* Therefore, the ALJ found that the RFC was supported by the medical evidence in the records.

The ALJ next determined that through the date last insured, Plaintiff was capable of performing his past relevant work as an institution director. *Id.* She found that this work did not require the performance of work-related activities precluded by Plaintiff's RFC. *Id.* The ALJ pointed to the testimonies of the vocational experts, Susan Lazarus and Lorin Lovely, who both stated that Plaintiff was able to perform his past relevant work as an institution director at the light level, (but performed as heavy according to Plaintiff) and skilled with an SVP of 7, as generally performed. *Id.* In comparing Plaintiff's RFC with the physical and mental demands of the past work, the ALJ finds that Plaintiff was able to perform it as generally performed. The ALJ also stated that she accepts the testimony of the vocational experts as it is consistent with the information found in the DOT and the Job Browser. *Id.* The ALJ concluded that Plaintiff was not under a disability, as defined by the SSA from May 15, 2010, the alleged onset date, through September 30, 2016, the date last insured. *Id.*

## II.   MOTIONS FOR SUMMARY JUDGMENT

In his Motion for Summary Judgment, Plaintiff argues that the ALJ's finding that Plaintiff's medically determinable mental impairments are non-severe is contrary to law and not

supported by substantial evidence, and that the ALJ's credibility assessment is deficient generally as a result of the error described above and in failing to consider Plaintiff's stellar work history. [DE 16-2, pg. 1].

In Defendant's Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment [DE 19], she asserts that substantial evidence supports the ALJ's decision and the ALJ applied the correct legal standards. [DE 19, pg. 6]. Specifically, Defendant argues that 1) the ALJ reasonably discounted Dr. Herrmann's opinion [DE 19, pg. 7]; 2) substantial evidence supports the ALJ's finding that Plaintiff had no severe mental impairment [DE 19, pg. 12]; 3) substantial evidence supports the ALJ's RFC finding [DE 19, pg. 14]; and finally, 4) substantial evidence supports the ALJ's subjective complaint analysis [DE 19, pg. 15].

### III.   LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the Commissioner's decision is "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." 42 U.S.C. § 405(g); *Crawford v. Comm'r of Soc. Sec.*, 363 F. 3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F. 3d 1436, 1439 (11th Cir. 1997)). Courts may not "decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F. 3d 1232, 1240, n. 8 (11th Cir. 2004) (quoting *Bloodsworth v. Heckler*, 703 F. 2d 1233, 1239 (11th Cir. 1983)).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the Commissioner's conclusions of law. *Brown v. Sullivan*,

921 F. 2d 1233, 1236 (11th Cir. 1991); *Martin v. Sullivan*, 894 F. 2d 1520, 1529 (11th Cir. 1990). "The [Commissioner's] failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F. 3d 1253, 1260 (11th Cir. 2007) (quoting *Cornelius v. Sullivan*, 936 F. 2d 1143, 1145-46 (11th Cir. 1991)).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920 (a)-(f). The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry concludes. 20 C.F.R. § 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If the ALJ finds that claimant does not suffer from a severe impairment or combination of impairments, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. § 404.1520(c).

Step three requires the ALJ to compare the claimant's severe impairment(s) to those in the listing of impairments. 20 C.F.R. § 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that, if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. *See Gibson v. Heckler*, 762 F. 2d 1516, 1518, n. 1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. § 404.1520(d).

Step four involves a determination of whether the claimant's impairments prevent him or her from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a *prima facie* case of disability is established. 20 C.F.R. § 404.1520(e). The

burden then shifts to the ALJ to show at step five that, despite the claimant's impairments, he or she can perform work in the national economy in light of the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f); *Phillips*, 357 F. 3d at 1239. In order to determine whether the claimant has the ability to adjust to other work in the national economy, the ALJ may either apply the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app.2, or utilize the assistance of a vocational expert. *See Phillips*, 357 F. 3d at 1239-40.

A. <u>Whether the ALJ's Finding that Plaintiff's Medically Determinable Mental Impairments are Non-Severe is Contrary to Law and not Supported by Substantial Evidence</u>

Plaintiff first argues that the ALJ erred when she assigned little weight to the opinion of the psychological consultative examiner, "on the basis that Plaintiff 'acknowledged that he was not receiving mental health treatment.'" [DE 16-2, pg. 4]. Plaintiff claims that while an ALJ may only reject a medical opinion for "good/specific/supported reasons," she "improperly substituted her lay opinion for that of the consultative examiner." *Id.* Plaintiff argues that the ALJ's finding that Plaintiff's medically determinable depression and anxiety were non-severe, and her failure to include any mental limitations in Plaintiff's RFC were in error. *Id.*

Plaintiff claims that the opinion evidence shows that Plaintiff's mental impairments cause more than minimal functional limitations and therefore are "severe." [DE 16-2, pg. 7]. Plaintiff points to Plaintiff's examination by Dr. Herrmann, who diagnosed Plaintiff with panic disorder and adjustment disorder with depressed mood. [DE 16-2, pg. 8]. Plaintiff adds that his primary care physician in 2014, Walter Comiskey, D.O., provided a medical source statement on Plaintiff's "medically determinable anxiety." [DE 16-2, pg. 9]. However, according to Plaintiff, the ALJ improperly substituted her own lay opinion for the opinions of Drs. Herrmann and Comiskey by finding that Plaintiff's mental limitations were non-severe. [DE 16-2, pg. 10].

Plaintiff argues that the ALJ improperly assigned little weight to the opinions of Dr. Comiskey and Dr. Herrmann, and that she did not provide adequate reasoning for her decision not to adopt the opinions of the medical sources. [DE 16-2, pg. 10]. Plaintiff argues that the ALJ failed to discuss Dr. Herrmann's specialty as a psychologist or the fact that he 1) examined Plaintiff at the Agency's request and 2) was chosen by the Agency to examine Plaintiff. [DE 16-2, pg. 11]. Plaintiff also points out that Dr. Herrmann both clinically interviewed Plaintiff and conducted a mental status exam and reviewed collateral medical records, which "not only enhances Dr. Herrmann's opinion as a matter of common sense" but is also a regulatory requirement that the ALJ was required to consider but did not. *See* 20 CFR 404.1527(c)(6); DE 16-2, pg. 12.

Plaintiff argues that the ALJ's error in rejecting Dr. Herrmann and Dr. Comiskey's opinions is not harmless because the proper inclusion of Plaintiff's mental limitations would have impacted the ALJ's finding that he could perform his past skilled work as an institutional director. [DE 16-2, pg. 18].

In its opposition, Defendant argues that substantial evidence indeed supports the ALJ's finding that Plaintiff had no severe mental impairment. [DE 19, pgs. 12-13]. Defendant points out, as an initial matter, that Plaintiff can show no reversible error at Step Two because the ALJ found that Plaintiff indeed suffered from a severe impairment ("other disorders of the urinary tract (20 CFR 404.1520(c))") and continued with the sequential evaluation process. [DE 19, pg. 13]. Defendant argues that the finding of any severe impairment is sufficient to satisfy the requirement of step two. *Id.* Further, Defendant argues that substantial evidence contained in the record and discussed by the ALJ supports the ALJ's decision, including multiple reports to medical providers by Plaintiff that his anxiety symptoms were stable and improved and that his functioning was "not difficult at all"; treatment notes showing normal mental status

examinations; Dr. Kanner's findings that Plaintiff's memory was intact and he interacted well; Dr. Herrmann's mental status exam which was primarily normal and showed only "mild" abnormalities; Plaintiff's lack of treatment for mental impairments; and Plaintiff's activities of daily living, which included being able to pay bills, perform self-care and household chores, care for his pets, grocery shop, and drive places. [DE 19, pgs. 13-14]. Defendant also points out that Plaintiff did not list any mental impairment as disabling when he applied for disability benefits. Defendant further argues that substantial evidence supports the ALJ's RFC finding and rejects the notion that the ALJ was required to base her RFC finding on the opinion of a physician. [DE 19, pg. 14].

The Court notes that an ALJ is required at step two of 20 C.F.R. § 404.1520 to determine whether the claimant's impairment is severe or not severe. "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild. An impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). The Eleventh Circuit Court of Appeals has further explained that, "if no severe impairment is shown [at step two] the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Brown*, 814 F.2d 585, 588 (11th Cir. 1987). As the ALJ continues to steps three, four, and five of the required analysis, the ALJ "is to consider the claimant's entire medical condition, including any impairment or combination of impairments, whether severe or not." *Childers v. Social Sec. Admin., Comm'r*, 521 Fed. Appx. 809, 811 (11th Cir. 2013) (citing *Jamison*, 814 F.2d at 588).

A severe impairment is an impairment that significantly limits a claimant's physical or mental abilities to perform basic work activities. *See* 20 CFR §§404.1520(a)(4)(ii) and (c), 404.1521; SSR 96-3p. An impairment must be severe for at least twelve consecutive months to be considered a severe impairment at step two of the sequential evaluation process. *See* 20 CFR §§ 404.1505(a), 404.1509. Agency regulations require the ALJ to use a "special technique" dictated by the Psychiatric Review Technique Form ("PRTF") for evaluating mental impairments. *See Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) (citing 20 C.F.R. 404.1520a). This "special technique" requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts four functional areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Moore*, 405 F.3d at 1213 (citing 20 C.F.R. 404.1520a-(c)(3-4)).The ALJ is required to incorporate the results of this technique into his findings and conclusions. 20 C.F.R. § 404.1520a-(e)(2). The regulations provide that if the ALJ finds that the degree of limitations in the first three functional areas is "mild" or "none," and there are no episodes of decompensations, then the ALJ will generally conclude that the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. 404.1520a(d)(1).

### 1. The Severity of Plaintiff's Mental Impairments

Here, the ALJ determined that Plaintiff's disorders of the urinary tract were indeed severe and therefore proceeded to the third step of analysis. [R. 13]. However, after considering the four broad functional areas discussed above, known as the "paragraph B" criteria, the ALJ declined to find that Plaintiff's mental impairments were severe. [R. 15]. The ALJ specifically found that Plaintiff's medical impairment of anxiety/depression did not cause more than minimal limitation

in Plaintiff's ability to perform basic work. *Id.* The ALJ found that Plaintiff had no limitation in understanding, remembering, or applying information, based on Plaintiff's reported ability to perform self-care and house-hold chores, including sweeping, mopping, laundry and ironing, cooking complete meals for himself, taking care of his pets, grocery shopping and driving. *Id.* The ALJ next found that Plaintiff had no limitation in interacting with others, as Plaintiff reported that he talks to his neighbors and does not have any problems getting along with family, friends, neighbors, or other people. *Id.* The ALJ found that Plaintiff had no limitation in concentrating, persisting, or maintaining pace, and in fact Plaintiff reported during his evaluation that he was analytical. *Id.* The ALJ also pointed out that Plaintiff demonstrated only mild memory deficits, responded appropriately to questions, had average task persistence and did not appear easily distracted. *Id.* The ALJ noted that Plaintiff was able to pay bills and count change, and during a physical, the examiner noted that Plaintiff gave an excellent history, interacted well, and had an intact memory. *Id.* Finally, the ALJ found that Plaintiff had no limitations in adapting or managing oneself as Plaintiff has the ability to perform self-care and household chores, take care of his pets, go to the pharmacy and doctor's appointments, and is able to drive. *Id.* The ALJ also found that there were no episodes of decompensation of an extended duration and therefore Plaintiff's mental impairments were non-severe. *Id.*

The Court finds that the ALJ correctly used the "special technique" required for evaluating mental impairments and that substantial evidence supports the ALJ's finding that Plaintiff had no limitations in social functioning, activities of daily living, and in concentration, persistence, or pace. [R. 15]. Substantial evidence also supports the ALJ's finding that Plaintiff suffered no episodes of decompensation. *Id.* The ALJ cited to substantial evidence in the record to support this finding, including Plaintiff's ability to perform self-care and house-hold chores,

including sweeping, mopping, laundry and ironing, cooking complete meals for himself, taking care of his pets, grocery shopping and driving. [R. 15, 250-258]. Even during Plaintiff's evaluation with Dr. Herrmann, Plaintiff was alert and oriented to time place and person, reported the date, location of the office, and his name, had normal speech, and presented logical and goal directed thought processes. [R. 529]. Although Dr. Herrmann wrote that Plaintiff demonstrated attention and concentration deficits, Plaintiff's task persistence was average, he responded appropriately to questions throughout the interview, and he did not appear to have been easily distracted. [R. 530]. Treatment notes from October 21, 2015 reflect that Plaintiff reported improvement of his anxiety symptoms and stated that functioning was not at all difficult. [R. 514].

Furthermore, the ALJ indeed found that Plaintiff suffered from a severe medical impairment (severe disorders of the urinary tract) and she did not terminate her findings at step two when she found that Plaintiff did not have a severe mental impairment. The ALJ indeed found at step two that Plaintiff suffers from severe disorders of the urinary tract and properly proceeded on with step three of the sequential evaluation process, and she specifically stated that Plaintiff's RFC "reflects the degree of limitation [the ALJ] found in the "paragraph B" mental function analysis." [R. 15]. It is clear to the Court that the ALJ considered the limitations caused by Plaintiff's mental impairments when determining Plaintiff's RFC.

## 2. The ALJ's Determination of Dr. Comiskey and Dr. Herrmann's Opinions

Although Plaintiff did not directly challenge the ALJ's decision to afford little weight to Dr. Comiskey's opinion, the Court finds that the ALJ provided a sufficient explanation as to why she attributed little weight to Dr. Comiskey's opinion. [R. 14]. The ALJ pointed out that Dr. Comiskey's medical source statement contained only checked boxes, opined that Plaintiff had

severe limitations without any accompanying treating notes, appeared to be based solely on Plaintiff's statements, and was not supported by the overall record. *Id.* The ALJ also pointed out that Dr. Comiskey's area of practice and relationship with Plaintiff was unknown.[2] *Id.* The ALJ stated she afforded Dr. Comiskey's opinion little weight because it was provided on a pre-developed form, it failed to provide an explanation or nexus for each disabling limitation stated therein, it was inconsistent with the medical record, and the opinions appeared to be based on Plaintiff's statements and allegations that are often contradicted by the Plaintiff's own statements. [R. 18]. The Court finds this reasoning to be specific and sufficient to explain why she did not adopt Dr. Comiskey's opinion and why she gave it little weight. The Court will not second guess the ALJ about the weight the treating physician's opinion deserves so long as she articulates a specific justification for it. *Hunter v. Soc. Sec. Admin. Comm'r,* 808 F.3d 818, 823 (11th Cir. 2015}.

The Court also finds that the ALJ reasonably assigned little weight to Dr. Herrmann's opinion. Dr. Herrmann was a one-time examiner and therefore is not entitled to any special deference. The ALJ owes no deference to the opinion of a physician who conducted a single examination: as such a physician is not a treating physician. *Eyre v. Comm'r, Soc. Sec. Admin.,* 586 F. App'x 521, 523 (11th Cir. 2014) (citing *McSwain v. Bowen,* 814 F.2d 617, 619 (11th Cir.1987)). In assessing medical opinions, the ALJ must consider a number of factors in determining how much weight to give to each medical opinion, including (1) whether the physician has examined the claimant; (2) the length, nature, and extent of a treating physician's relationship with the claimant; (3) the medical evidence and explanation supporting the physician's

---

[2] In Plaintiff's Motion, Plaintiff asserts that Dr. Comiskey was Plaintiff's treating physician between 2009 and 2015. [DE 16-2, pg. 16].

opinion; (4) how consistent the physician's "opinion is with the record as a whole"; and (5) the physician's specialization. *Id.* (citing §§ 404.1527(c), 416.927(c)). These factors apply to both examining and non-examining physicians. *Id.,* §§ 404.1527(e), 416.927(e). The ALJ properly provided adequate reasons for discounting Dr. Herrmann's opinion. [R. 19]. The ALJ found that Dr. Herrmann's opinion appeared to be based on Plaintiff's subjective allegations. [R. 19]. Dr. Herrmann's report stated that he diagnosed Plaintiff with panic disorder based on Plaintiff's "history of anxiety, panic symptoms on a frequent basis associated with his fear of a heart attack and his trips to the emergency room." [R. 531]. However, there is only one instance of Plaintiff seeking treatment at an emergency room in the medical record, and Plaintiff sought treatment for a urinary tract infection. [R. 533-548]. Dr. Herrmann also wrote that he based his diagnosis of Adjustment Disorder with Depressed Mood on Plaintiff's history of depression associated with psychological stressors and reported health problems. [R. 531]. This clearly shows that Dr. Herrmann relied heavily on Plaintiff's subjective complaints while preparing his report. However, there are multiple instances in the medical record that contradict those complaints and Dr. Herrmann's opinion. Dr. Uribe noted on April 27, 2016 that Plaintiff's anxiety symptoms were stable and described his functioning as "not difficult as all." [R. 565]. During an examination in May 2016, Dr. Kanner noted that Plaintiff alleged an inability to concentrate and diminished memory due to an inability to sleep, but provided an excellent history, presented flat affect, had an intact memory and interacted well during the interview. [R. 493].

The ALJ also correctly pointed out that Plaintiff did not seek extensive medical care for his mental impairments. [R. 15, 19]. The ALJ observed that Plaintiff testified he was not receiving mental health treatment, and although he took medication for panic attacks as needed, there are August 28, 2016 treatment notes which document that Plaintiff stated that he does not take

medications at home. [R. 544]. After a careful review of the record, the Court finds that the ALJ did articulate several explicit and adequate reasons for affording Dr. Herrmann's testimony little weight. This Court cannot reweigh the evidence or substitute its judgment for that of the ALJ, and therefore finds that the ALJ did not err when she afforded little weight to the opinion of Dr. Herrmann.

### 3. The ALJ's Determination of Plaintiff's Credibility

Plaintiff argues that the ALJ failed to consider Plaintiff's exemplary work history when evaluating his credibility. [DE 16-2, pg. 19]. Plaintiff argues that agency policy requires that a Plaintiff's exemplary work history be considered as part of a credibility assessment, that the ALJ failed to consider this highly relevant factor, and therefore, that the ALJ's decision should be reversed and remanded. [DE 16-2, pgs. 19-20]. In opposition, Defendant claims that the ALJ provided proper reasons, supported by substantial evidence, for discounting Plaintiff's subjective complaints. [DE 19, pg. 15]. Defendant argues that first, the ALJ noted that Plaintiff obtained unemployment benefits, which "infers that he was willing and capable of employment;" second, Plaintiff's subjective complaints were inconsistent with the medical record, as described above; and third, Plaintiff testified that he took medication as needed, reported that he was not taking medication in August, 2016, and testified that he was not receiving mental health treatment. [DE 19, pgs. 16-17].

When considering a claimant's symptoms, the ALJ must follow a two-step process: first, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment(s) ... that could reasonably be expected to produce the claimant's pain or other symptoms." *Bianchi v. Berryhill,* No. 16-60574-CIV, 2017 WL 6947800, at *9 (S.D. Fla. July 12, 2017) (citing *Polanco v. Colvin*, No. 12-22347-CIV-SIMONTON, 2016 WL 5464583, at

*12 (S.D. Fla. Sept. 29, 2016) (citing SSR 16-3p)). Second, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent that [the symptoms] limit [the claimant's] functioning." *Id.* If the claimant's statements regarding his or her symptoms are "not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record." *Id.*

An ALJ's credibility determinations are given due deference, but the ALJ must explicitly and adequately articulate the reasons for discrediting a claimant's testimony. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *see also Lezcano v. Colvin*, No. 15-22399-CIV, 2016 WL 3999760, at *14 (S.D. Fla. July 26, 2016) (A reviewing court "may not disturb a clearly articulated credibility finding supported by substantial evidence" (citing *Moore*, 405 F.3d at 1212)). While the ALJ is not required to refer to every piece of evidence, the credibility determination must not be "a broad rejection." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in record. [R. 17]. The ALJ briefly described the medical records of Plaintiff spanning from 2010 through 2016 and pointed to several reports by physicians that Plaintiff's symptoms were "moderate in severity." [R. 17]. The ALJ also pointed out that Plaintiff sought unemployment benefits and that he was not receiving treatment for several of his impairments. [R. 14-14]. Thus, the Court finds that there is no merit to Plaintiff's argument that the ALJ erred by failing to consider his strong work history because the ALJ based her credibility determination on several factors and clearly articulated her finding. *See Bianchi*,

2017 WL 6947800, at *10 n. 12.

Therefore, the Court finds that substantial evidence, which is described in detail above, and which is contained in the record, supports the ALJ's mental and physical RFC and findings. The Court finds that the ALJ clearly considered Plaintiff's entire medical condition in evaluating Plaintiff's RFC and the credibility of Plaintiff's subjective claims. The Court also finds that the vocational findings based on the RFC are supported by the substantial record evidence. The Court concludes that the record contains substantial evidence to support the denial of benefits to Plaintiff and that the correct legal standards have been applied. Accordingly, the ALJ's decision is due to be affirmed.

## IV. CONCLUSION

The Court finds that the record contains substantial evidence to support the denial of benefits to Plaintiff. The Court further finds that the ALJ applied the correct legal standards.

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the decision of the Commissioner is **AFFIRMED**. Accordingly, Plaintiff's Motion for Summary Judgment [DE 16] is hereby **DENIED**, and Defendant's Motion for Summary Judgment [DE 19] is hereby **GRANTED**.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 25th day of February, 2019.

WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE